Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Ann T. Wick
Assistant United States Attorney
920 West Riverside, Suite 340
Spokane, Washington 99207
(509) 353-2767

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

    Plaintiff,

v.

TONY J. BOLEN (a/k/a "Tony James Gregory Bolen"),

    Defendant.

NO: 2:23-CR-00074-MKD

United States' Response to Motion to Quash

    United States of America, by and through Vanessa R. Waldref, United States Attorney for the Eastern District of Washington, and Ann T. Wick and Laurel J. Holland, Assistant United States Attorneys for said district, hereby responds to Witness Teona Wood's Motion to Quash, ECF No. 155. The United States submits that the Motion should be denied.

    Common law recognizes two separate privileges arising out of the marital relationship: (1) the "anti-marital facts" privilege, which prohibits one spouse from testifying against another during the length of the marriage, and (2) the so-called "marital communications" privilege, which bars testimony concerning statements privately communicated between spouses. *United States v. Marashi*, 913 F.2d 724,

United States' Response to Motion to Quash

1

729 (9th Cir. 1990). Although the two privileges have overlapping interests, and therefore cases discussing both are instructive, only the first privilege is at issue in this case.

The spousal testimonial privilege prohibits one spouse from testifying against the other in criminal cases during their marriage, and "the witness-spouse alone has a privilege to refuse to testify adversely." *Trammel v. United States*, 445 U.S. 40, 53, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980). The privilege, however, is not absolute, nor without exception. *See* Fed. R. Evid. 501 (directing that "common law – as interpreted by United States courts in the light of reason and experience – governs a claim of privilege" unless provided otherwise by the Constitution, federal statute, or rules prescribed by the Supreme Cout"). "In enacting Rule 501, Congress manifested an affirmative intention not to freeze the law of privilege." *Trammel*, at 47. The purpose of Rule 501 "was to provide the courts with the flexibility to develop rules of privilege on a case-by-case basis." *Id*. (internal quotations and citation omitted).

Moreover, because "[t]estimonial exclusionary rules and privileges contravene the fundamental principle that 'the public . . . has a right to every man's evidence[,]' . . . they must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.' *Trammel*, 445 U.S. at 50 (internal quotations and citations omitted). To do otherwise allows a privilege to "go[] far beyond making 'every man's house his castle,' and permits a person to convert his house into 'a den of thieves.' . . . It 'secures, to every man, one safe and unquestionable and every ready accomplice for every imaginable crime.'" Id. at 51-52 (internal citation omitted).

As a threshold matter, Ms. Wood's invocation of marital privilege should be rejected because the marriage was never "valid" for purposes of federal privilege.

United States' Response to Motion to Quash

2

Although a sham marriage, like that of Ms. Wood to Defendant Casey Greer, may be "valid" under state law, that does not make it "valid" for purposes of invoking federal privileges or obtaining federal benefits. *Lutwak v. United States*, 344 U.S. 604, 615 (1953) (holding that "ostensible wives" were competent to testify against "their ostensible husbands" in a case alleging conspiracy to defraud the United States under 18 U.S.C. § 88); *In re Grand Jury Proceedings (84-5)*, 777 F.2d 508, 509 (9th Cir. 1985) (per curiam) ("The Ninth Circuit recognizes a sham marriage exception to the marital privilege of not having to testify against a spouse."); *United States v. Saniti*, 604 F.2d 603, 604 (9th Cir. 1979) (per curiam) (husband to sham marriage could not invoke marital testimonial privilege); *Dabaghian v. Civiletti*, 607 F.2d 868, 869 (9th Cir. 1979) (holding that a marriage is "valid" for purposes of obtaining immigration benefits if it "is not sham").

Spousal testimonial privilege is not available to a witness-spouse when "the purpose of the marriage was for . . . invoking the [spousal testimonial] privilege." *United States v. Saniti*, 604 F.2d 603, 604 & n.1 (9th Cir. 1979) (per curiam). As the Supreme Court reasoned in *Lutwak*:

> When the good faith of the marital relation is pertinent and it is made to appear to the trial court, as it was here, that the relationship was entered into with no intention of the parties to live together as husband and wife but only for the purpose of using the marriage ceremony in a scheme to defraud, the ostensible spouses are competent to testify against each other.... The reason for the rule at common law disqualifying the wife is to protect the sanctity and tranquility of the marital relationship. It is hollow mockery for the petitioners in arguing for the policy of the rule to invoke the reason for the rule and to say to us 'the husband and wife have grown closer together as an emotional, social, and cultural unit' and to speak of 'the close emotional ties between husband and wife' and of 'the special protection society affords to the marriage relationship.' In a sham, phony, empty ceremony such as the parties went through in this case, the reason for the rule disqualifying a spouse from giving testimony disappears, and with it the rule.

United States' Response to Motion to Quash

3

Lutwak, 344 U.S. at 614-15 (internal citation omitted).

Allowing a defendant to benefit from the spousal testimonial privilege while engaged in marriage fraud makes a "mockery" of the privilege and fails to balance the use of the privilege with "society's strong interest in the administration of justice." *Marashi*, 913 F.2d at 730. In the context of sham marriages, the purpose of the privilege - protecting the sanctity and tranquility of the marital relationship - vanishes entirely. *Cf. United States v. White*, 974 F.2d 1135, 1138 (9th Cir. 1992) (the marital communications privilege exists to "protect[ ] the integrity of marriages and ensur[e] that spouses freely communicate with one another."); *Wolfle v. United States*, 291 U.S. 7, 14 (1934) (holding that the marital communications privilege is designed to "protect[ ] … marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails.").

Here, Defendant Greer married Ms. Wood so that she may invoke the spousal testimonial privilege. This is evidenced through countless recorded calls between Defendant Greer and Ms. Wood, wherein the couple discuss getting married and its effect on Defendant Greer's upcoming state criminal trial. It is further evidenced through text messages between Defendant Greer and others, wherein Defendant Greer expresses no actual intent to marry or even continue to cohabitate with Ms. Wood, but for the fact that he does not have another option.

Defendant Greer was arrested on January 15, 2022. A mere seven days later, on January 22, 2022, Defendant Greer tells Ms. Wood in a recorded jail call,[1] "You

---

[1] The following representations and quotations of the recorded calls are the undersigned's best attempt at transcription of the recorded calls, within the brief amount of time available since the filing of Ms. Wood's Motion to Quash. Prior to Mr. Partovi's appointment, Ms. Wood's previous counsel advised the government that he did not think the marital privilege applied. The government does not

United States' Response to Motion to Quash
4

need to keep your strength up because you're going to be working yourself to the bone just to get me out of here." After a pause, Ms. Wood responds, "And how much is a marriage license?" During the same call, the two discuss that they cannot get married in their church without marriage counseling, indicating that they had not initiated that process before Defendant's arrest.

On April 5, 2022, there is a pretrial conference in Defendant Greer's state case, and trial is scheduled for June 13, 2022. On the same day, Defendant Greer called to let Ms. Wood know that he needed to resubmit a marriage application. He explained that he "can resubmit it stating that you cannot be a state's witness." Ms. Wood says, "Ok, and then she will have no choice but to let us get married? Defendant Greer responds, "Yeah, pretty much" and "I might have to talk to my attorney about it first. Ms. Wood asks, "Why would you have to talk to your attorney about it?" The answer: "So that he can inform the prosecutor." Ms. Wood then says, "Ok, well you need to show him proof that they cannot use me as a witness because how long we lived together."

The couple quickly marry, over a recorded call, on May 8, 2022. Notably, after the very brief ceremony, when the officiant is discussing the filing of the marriage certificate the next morning, Ms. Wood expresses excitement. Rather than express any form of excitement or joy in return, Mr. Greer merely asks, "When is that going to get turned in?"

It is apparent from subsequent recorded calls that the marriage certificate did not get filed as quickly as Defendant Greer wanted and that Ms. Wood and Defendant Greer are predominantly concerned with telling the prosecutor of the marriage. Ms. Wood asks, "How long do you think it will be before the prosecutor knows that we're married?" Defendant Greer responds, "I don't know, but I assume

represent that these proffered examples are verbatim and is preparing select recordings for review by the Court as needed.

it's already been filed." Ms. Wood indicates she will text the officiant's wife. Defendant Greer, sounding frustrated, said, "Well, he said that he was going to do that this morning." Ms. Wood turns the conversation to a concern she has regarding Defendant Greer's review of the discovery in his case, particularly what she said in her interview with law enforcement: "I don't remember exactly what I have said, I am just hoping – like I told you kind of what I said, but I'm hoping that if you don't like something I mentioned or said, then I don't what you to go back on not, you know, not wishing you hadn't married me."

Defendant Greer returns the conversation yet again to the filing of the marriage certificate and the prosecutor, confirming that the certificate would have been filed this morning. Ms. Wood says, "Yeah, but either way it's done. We're married. We have the certificate, or I have the certificate, so it's done." He reminds her that it is "not official until it gets filed." She reassures him, "Well, they are on their way now, so it will be done." Defendant Greer then expresses frustration that the delay in filing the certificate will delay the prosecutor learning of the marriage. The prosecutor's knowledge of the marriage continues to be a topic of discussion in several calls thereafter.

Prior to Defendant's arrest, Defendant Greer's text messages clearly indicate that he does not intend to marry Ms. Wood and is living with her to avoid being homeless. For example, in documented text messages between Defendant Greer and Ashley Summa, in September 2021, Ms. Summa refers to Ms. Wood as Defendant Greer's "future wife." As evidenced below, Defendant Greer responds, "NO FUCKING WAY IN HELL!!!!"

United States' Response to Motion to Quash

6

| | | | | | | |
|---|---|---|---|---|---|---|
| Ashley | Casey, Ashley, Natasha | 09/03/21 | 23:02 | 10 | Ashley | I wish u could stay here dude |
| Ashley | Casey, Ashley, Natasha | 09/03/21 | 23:02 | 11 | Casey | Same |
| Ashley | Casey, Ashley, Natasha | 09/03/21 | 23:02 | 12 | Ashley | Sorry |
| Ashley | Casey, Ashley, Natasha | 09/03/21 | 23:02 | 13 | Casey | I don't condone bullying for ANY reason I'm sure this is why people like Joelle bullied her! Even her ex, Danny, can't stand her and says she's psycho, and coming from him, that says a lot! |
| Ashley | Casey, Ashley, Natasha | 09/03/21 | 23:02 | 14 | Ashley | BAHAHAHAHHAHAH well she is a little psycho |
| Ashley | Casey, Ashley, Natasha | 09/03/21 | 23:02 | 15 | Casey | Only a little? Try a lottle! |
| Ashley | Casey, Ashley, Natasha | 09/03/21 | 23:02 | 17 | Ashley | Haha crazy psycho |
| Ashley | Casey, Ashley, Natasha | 09/03/21 | 23:02 | 18 | Casey | Definitely! |
| Ashley | Casey, Ashley, Natasha | 09/03/21 | 23:02 | 19 | Ashley | That's your future wife your talking about |
| Ashley | Casey, Ashley, Natasha | 09/03/21 | 23:02 | 20 | Casey | NO FUCKING WAY IN HELL!!!! |

Later that month, Defendant Greer tells Ms. Summa that he regretted "getting back together with" Ms. Wood, and that if Ms. Wood moved, it would make him "homeless."

United States' Response to Motion to Quash

7

| Sender | Conversation | Date | Time | # | From | Message |
|---|---|---|---|---|---|---|
| Ashley | Casey & Ashley | 09/16/21 | 13:10 | 28 | Ashley | Idk how u do it |
| Ashley | Casey & Ashley | 09/16/21 | 13:10 | 29 | Casey | I'm worn out because of it |
| Ashley | Casey & Ashley | 09/16/21 | 13:10 | 30 | Ashley | No shit. I think it is taking a toll on tash too |
| Ashley | Casey & Ashley | 09/16/21 | 13:10 | 31 | Casey | I know it is. The 2 months we were broken up, everyone at church told me how much happier I looked. I totally regret getting back together with her but at the time I loved her and I hoped she would change. That was obviously too much to hope for... |
| Ashley | Casey & Ashley | 09/16/21 | 13:10 | 32 | Ashley | BAHAHA |
| Ashley | Casey & Ashley | 09/16/21 | 13:10 | 33 | Ashley | She's never gunna change and I told her that |
| Ashley | Casey & Ashley | 09/16/21 | 13:10 | 34 | Casey | I'm at Scarywood today and tomorrow only from 4-8. Saturday is 4:30-6:30 |
| Ashley | Casey & Ashley | 09/16/21 | 13:10 | 35 | Ashley | That's ok it's a smal break |
| Ashley | Casey & Ashley | 09/16/21 | 13:10 | 36 | Casey | Everyone sees that except her. Just like she tried saying she's in a toxic relationship and I told her that she's the toxic one and everyone sees that except her |
| Ashley | Casey & Ashley | 09/16/21 | 13:10 | 37 | Casey | A small break is better than none |
| Ashley | Casey & Ashley | 09/16/21 | 13:10 | 38 | Ashley | Yup |
| Ashley | Casey & Ashley | 09/16/21 | 13:10 | 39 | Ashley | And she won't let you drive yourself? Waste of gas |
| Ashley | Casey & Ashley | 09/16/21 | 13:10 | 40 | Casey | I guess she doesn't want to be with my anymore because I won't defent her from Shawna when there's nothing to defend her from. So now she's looking at apartments and if she moves, I can't go with her, making me homeless. |

Besides wishing he could stay with Ms. Summa, Defendant Greer also discusses the wish that he could move in with Defendant Bolen in text messages. For example, the following exchange occurred on September 8, 2021:

- o Bolen: Maybe I can get a big enough house for you to move in
- o Greer: Maybe
- o Bolen: I know you want to get away from her
- o Greer: Definitely
- o Bolen: That's why I suggested what I said
- o Greer: I know I appreciate it

United States' Response to Motion to Quash

8

The facts and circumstances indicate Defendant Greer clearly sought to be married only after being arrested and facing prosecution. Once married, his primary concern was that of informing the prosecutor in his case. Likewise, Ms. Wood is also preoccupied with the marriage as a tool to avoid testifying in Defendant Greer's trial, particularly to the statements she made to law enforcement, wherein she identified Defendant Greer's penis in the child pornography images depicting the sexual abuse of Minor S.

Under no circumstances should sham spouses benefit from application of spousal testimonial privilege. The policy behind the spousal testimonial privilege - "to protect the sanctity and tranquility of the marital relationship" - is not present and it would be a "hollow mockery" to apply the privilege under such circumstances. Accordingly, applying the privilege in this case is contrary to the purpose and policy of the rule. The United States respectfully submits that the Motion to Quash be denied.

The government notes that the United States intends to inquire of Ms. Wood of topics beyond the coverage of any spousal testimonial privilege. For example, the United States intends to elicit her knowledge of Minor S, her caretaking of Minor S, her knowledge of Defendant Bolen and his history, and her inability to access the contents of Defendant Greer's iCloud account and iPhone.

Dated: December 11, 2024.

Vanessa R. Waldref
United States Attorney

*s/Ann T. Wick*
Ann T. Wick
Assistant United States Attorney

United States' Response to Motion to Quash
9

**CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to defense counsel of record.

*s/ Ann T. Wick*

Ann T. Wick
Assistant United States Attorney